## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL RELIEF AND )
DEVELOPMENT, INC. )
1621 North Kent Street )
Fourth Floor )
Arlington, Virginia 22209, )
 )
INTERNATIONAL RELIEF AND )
DEVELOPMENT US, INC. )
1621 North Kent Street )
Fourth Floor )
Arlington, Virginia 22209, )
 )
INTERNATIONAL RELIEF AND )
DEVELOPMENT HOLDINGS, INC. )
1621 North Kent Street )
Fourth Floor )
Arlington, Virginia 22209, )
 )
INTERNATIONAL RELIEF AND )
DEVELOPMENT SOLUTIONS, LLC )
1621 North Kent Street )  Case No. _____
Fourth Floor )
Arlington, Virginia 22209, )
 )
INTERNATIONAL RELIEF AND )
DEVELOPMENT GLOBAL INSTITUTE )
Povestova 37 )
1000 Ljubljana )
Slovenia, )
 )
and )
 )
INTERNATIONAL RELIEF AND )
DEVELOPMENT GLOBAL SOLUTIONS )
Postna Ulica 18 )
1351 Slovenia, )
 )
       Plaintiffs, )
 )
 )
 )
 )

| | |
|---|---|
| vs. | ) |
| | ) |
| UNITED STATES AGENCY FOR | ) |
| INTERNATIONAL DEVELOPMENT | ) |
| 1300 Pennsylvania Avenue, N.W. | ) |
| Washington, D.C. 20523, | ) |
| | ) |
| ALFONZO E. LENHARDT, in his official | ) |
| capacity as Acting Administrator of the United | ) |
| States Agency for International Development | ) |
| 1300 Pennsylvania Avenue, N.W. | ) |
| Washington, D.C. 20523, | ) |
| | ) |
| AMAN S. DJAHANBANI, in his official | ) |
| capacity as the Suspension and Debarment | ) |
| Official, Director, Office of Acquisition and | ) |
| Assistance, of the United States Agency for | ) |
| International Development | ) |
| 1300 Pennsylvania Avenue, N.W. | ) |
| Washington, D.C. 20523, | ) |
| | ) |
| and | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT FOR VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs International Relief and Development, Inc. ("IRD, Inc."); International Relief and Development US, Inc.; International Relief and Development Holdings, Inc.; International Relief and Development Solutions, LLC; International Relief and Development Global Solutions; and International Relief and Development Global Institute (hereinafter collectively referred to as Plaintiffs or "IRD"), seek relief pursuant to the Administrative Procedure Act, §§ 702-704, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, from the suspension of Plaintiffs from federal procurement and non-procurement contracts and awards imposed by Defendant United States Agency for International Development ("USAID").  The suspension was imposed by agency

2

decision of January 26, 2015 ("Suspension Notice"), timely challenged by Plaintiffs before the agency in an administrative proceeding pursuant to 2 C.F.R. Part 180 (2015), yet nonetheless confirmed by final agency decision of April 13, 2015 ("Suspension Continuation") (collectively "Suspension Decisions").   The Suspension Decisions constitute final agency action that was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation, in violation of the Administrative Procedure Act.   Plaintiffs respectfully request that the Court declare the Suspension Decisions null, void and unenforceable, enjoin their enforcement, and grant further relief to assure that subsequent agency decisions concerning IRD, including the suspension-related decisions, the extension or modification of existing procurement and non-procurement vehicles, and the awards of new procurement and non-procurement vehicles, conform with requirements of law and regulation.

## I.      PARTIES

### A.      Plaintiffs

1.      IRD, Inc. is a Virginia non-profit, nongovernmental organization, with its headquarters and principal place of business at 1621 North Kent Street, Suite 400, Arlington, Virginia 22209, that was suspended on January 26, 2015.

2.      International Relief and Development US, Inc., an affiliate of IRD, Inc., is a non-profit, nongovernmental organization, with its headquarters and principal place of business at 1621 North Kent Street, Suite 400, Arlington, Virginia 22209, that was suspended on February 10, 2015 as an affiliate of IRD, Inc.

3.      International Relief and Development Holdings, Inc., an affiliate of IRD, Inc., is a non-profit, nongovernmental organization, with its headquarters and principal place of business at 1621 North Kent Street, Suite 400, Arlington, Virginia 22209, that was suspended on

3

February 10, 2015 as an affiliate of IRD, Inc.

    4.  International Relief and Development Solutions, LLC, an affiliate of IRD,

Inc., is a for-profit, nongovernmental organization, with its headquarters and principal place of

business at 1621 North Kent Street, Suite 400, Arlington, Virginia 22209, that was suspended on

February 10, 2015 as an affiliate of IRD, Inc.

    5.  International Relief and Development Global Institute, an affiliate of IRD,

Inc., is a non-profit, nongovernmental organization an address of Povestova 37, 1000 Ljubljana,

Slovenia, that was suspended on February 10, 2015 as an affiliate of IRD, Inc.

    6.  International Relief and Development Global Solutions is an affiliate of

IRD, Inc., and is a for-profit, nongovernmental organization with an address of Postna Ulica 18,

1351 Slovenia, that was suspended on February 10, 2015 as an affiliate of IRD, Inc.

**B.**  **Defendants**

    7.  Defendant USAID is an agency within the Executive Branch of Defendant

United States of America.  The allegations set forth herein as to Defendant USAID extend to and

include the employees, officers, agents, consultants and other personnel or units within USAID

whose actions contributed to the agency actions complained of in this Complaint.

    8.  Defendant Alfonzo E. Lenhardt is the Acting Administrator of USAID and

is being sued in his official capacity and is subject to suit pursuant to 5 U.S.C. §§ 702-703.  The

allegations set forth herein as to Defendant Lenhardt are as to him individually, and also extend

to and include the employees, officers, agents, consultants, and other personnel or units within

USAID working under Defendant Lenhardt's direction and control.

    9.  Defendant Aman S. Djahanbani is and at all relevant times was the

USAID Suspension and Debarment Official ("SDO"), and is being sued in his official capacity

as SDO, the USAID agency official who issued the Suspension Decisions, and in his capacity as Director, Office of Acquisition and Assistance ("OAA") of Defendant USAID.  Defendant Djahanbani is subject to suit pursuant to 5 U.S.C. §§ 702-703.  The allegations set forth herein as to Defendant Djahanbani and his department are as to him individually, and also extend to and include the employees, officers, agents, consultants and other personnel or units within USAID working under Defendant Djahanbani's direction and control.

10.     Defendant United States of America has acted through Defendants USAID, Lenhardt, Djahanbani and the other officers, employees and agents of the United States.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This action seeks judicial review of, and to set aside, the Suspension Decisions under the Administrative Procedure Act §§ 702-704, 706, and appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  Plaintiffs have no other adequate remedy in a court by other statutory means.

12.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1), because Defendants' principal place of business is in this district, a substantial part of the events giving rise to the claims herein, and numerous communications between the parties relating to the Suspension Decisions occurred within this district.

## III.     NATURE OF THE ACTION AND INTRODUCTION

13.     This action seeks judicial review of and relief from the Suspension Decisions on the grounds that those decisions constitute final agency action in violation of the Administrative Procedure Act, as arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation.  Suspension of a government contractor

5

or grant recipient from receiving federal procurement and non-procurement agreements and awards is a serious and extreme action that—by regulation—may only be imposed on the basis of adequate record evidence establishing, *inter alia*, that "immediate action is necessary to protect the Government's interests." This requirement exists, in part, because of the potentially devastating economic consequences of a suspension on the suspended entity, which is precluded for as long as a year from receiving new federal contracts and grants or other federal awards, or extensions or modifications of existing contracts or awards, or serving as a subcontractor or subrecipient for other federal contractors or awardees.  For entities such as IRD, whose business is derived almost entirely from performing federal contracts, grants, and cooperative or assistance agreements, the imposition of a suspension is tantamount to the "economic death penalty," because the suspension effectively deprives the entity of the economic means of support for such a considerable period of time—up to one year—that it is unlikely to survive. Moreover, applicable regulations make clear that agencies are prohibited from imposing suspensions for punitive purposes; rather, the sole purpose of a suspension is to protect the immediate interests of the federal government.

14.     The Suspension Decisions were issued under Nonprocurement Common Rule ("NCR") authority, 2 C.F.R. Part 180, and specifically 2 C.F.R. Subpart G, Section 180.700 *et seq.*  The Suspension Decisions rely solely upon the "catch-all" suspension provisions of 2 C.F.R. §§ 180.700(b), (c), and § 180.800(d), as the regulatory basis for the suspension. Suspension Notice, at 1; Suspension Continuation, at 1. The Suspension Notice asserts there was, concerning IRD, "adequate evidence to suspect . . . [a] cause of debarment listed under" Section 180.800(d).  *Id.*  Section 180.800(d) is the generic "catch-all" debarment ground of "any other cause of so serious or compelling a nature that it affects your present responsibility."  Defendants

6

asserted no other legal basis for the suspension, and had none.

15.     As the Suspension Decisions challenged IRD's "present responsibility" under NCR authority, the applicable present responsibility requirements are provided at 2 C.F.R. § 200.205(c), *Federal awarding agency review of risk posed by applicants*  Those nonprocurement standards for present responsibility generally parallel the procurement responsibility standards at Federal Acquisition Regulation ("FAR") 9.104-1.   The FAR affirmative responsibility standards include: (i) adequate financial resources; (ii) ability to comply with performance requirements; (iii) satisfactory performance record; (iv) satisfactory record of integrity and business ethics; (v) necessary facilities; and, (vi) is otherwise qualified under applicable law and regulation.   FAR 9.104-1.   Section 200.205 almost expressly encompasses the FAR standards of adequate financial resources, ability to comply with performance requirements, satisfactory performance record, necessary facilities, and is otherwise qualified under applicable law and regulation, but notably does not include FAR 9.104-1's standard of a satisfactory record of integrity and business ethics.  Additionally, under 2 C.F.R. § 180.700, the mitigation factors contained in 2 C.F.R. § 180.860 may, and should, be considered in the agency's responsibility determination.   Under NCR authority, the initial burden of presentation is on the agency to show good cause and adequate evidence for a suspension, *see* 2 C.F.R. §§ 180.800(d), 180.855(a). Only if those burdens are first met by the agency does the burden shift to a respondent to show present responsibility.  Section 180.855(b).

16.     All suspensions imposed under NCR authority require a finding that "[i]mmediate action is necessary to protect the public interest."   Section 180.700(c).   The Suspension Notice was based solely on the asserted conclusion that an imminent danger to the United States arose from: (a) mischarging of indirect costs by a former IRD president who left

7

IRD in August 2014, five months *before* the Suspension Notice; and, (b) IRD allegedly having inadequate financial controls to perform government cost contracts and awards.

17.     Defendants' conclusion that immediate action was needed to protect the government is belied, however, by the January 26, 2015 Suspension Notice itself, which does not specifically analyze how a need for immediate action or a threat of immediate harm existed on January 26, 2015 by virtue of IRD's present responsibility.  Nor could it have, as the matters discussed in the Suspension Notice were matters that: (a) Defendants had known about for many months before the Suspension Notice, based on materials submitted to Defendants by IRD as part of IRD's own corrective action program, and during those many months Defendants had seen no cause for immediate danger; and, (b) had already been substantially addressed by IRD's own corrective action program, of which Defendants had been regularly apprised and in which representatives of Defendants USAID and United States had, in some measures, actively participated.

18.     That IRD's financial controls in fact presented no immediate danger to the interests of the United States on January 26, 2015 is established by Defendants themselves. During the months preceding the Suspension Notice, Defendants issued, extended or modified a number of existing IRD contracts and awards.   In the days immediately preceding the Suspension Notice, and again after issuing the Suspension Notice, Defendants extended or modified existing IRD contracts and awards, increasing contract and award values by approximately $32.5 million.

19.     Defendants' subsequent conclusion on April 13, 2015 in the Suspension Continuation, that IRD's financial controls continued to present a need for immediate action or an imminent danger to the United States, was also shown to be contrary to, and unsupported by,

the administrative record.  Prior to April 13, as part of the agency's suspension proceeding, IRD presented evidence prepared by leading national accounting firms and experts on indirect cost accounting and internal financial controls, BDO USA LLP ("BDO") and Ernst & Young, LLP ("EY").  The evidence first established and quantified the mischarging by the former IRD President and Chief Executive Officer ("CEO"), Arthur Keys ("Dr. Keys"), between FY 2009 and FY 2014, was less than 1% of total IRD indirect charges over that period, and IRD allowable indirect cost charge submissions for FY 2013 were more than 97.5% accurate.  Second, EY concluded that IRD has in-place financial systems sufficient to meet legal requirements.  In response, Defendants failed to provide any evidence of their own to the contrary, but instead: (a) chose to rely largely on the record from the Suspension Notice that had not shown evidence of an immediate threat of harm; (b) presented no explanation concerning why the matters covered by the BDO report presented an immediate threat of harm; and, (c) simply critiqued and parsed the EY evidence of adequate IRD financial controls, a critique unsupported by any expert evidence of their own.  Defendants' April 13, 2015 conclusion of immediate harm was further undercut by Defendants' own decision during the suspension proceeding, between January 26 and April 13, 2015, to issue a $22 million contract extension to IRD based on "compelling reason" exception authority permitting an agency head or designee to award despite the suspension.

        20.    Defendants' Suspension Decisions also disregarded and violated fundamental procedural and substantive safeguards that exist to prevent the harsh consequence of the "economic death penalty" of suspension being imposed lightly or without adequate basis. Among these are: (a) USAID's failure to employ authorized "specific award conditions" on USAID awards to IRD to mitigate perceived risks before imposing the extreme tool of suspension; (b) the Suspension Decisions were *not* the independent decision of the SDO, but

9

rather were dictated by senior USAID management based on political concerns, and were the product of a suspension process with inherent conflicts, as USAID policy makes the SDO also the OAA Director, responsible for management of the agency's contracts and awards, thus placing the SDO in the position of adjudicating suspension and debarment actions in which the SDO, in the capacity of OAA Director, or his office, were involved; and (c) the failure to address adequately the mitigating factors that weighed heavily in favor of IRD's present responsibility and against suspension, including IRD's cooperation with a USAID Office of Inspector General ("OIG") investigation, and IRD's willingness to enter into an administrative agreement with USAID tailored to address any continuing USAID concerns as to IRD's present responsibility.

21.     The Suspension Decisions were also contrary to and unsupported by substantial evidence and the facts of record, and the Suspension Continuation unlawfully relied upon unresolved, contested material facts that IRD had disputed, including facts specifically identified as contested and material pursuant to the applicable regulation governing USAID suspension proceedings, 2 C.F.R. § 180.730(a)(1).  That regulation requires that, when the suspended entity presents facts that raise a genuine dispute of material fact, the SDO is to order an independent fact-finding proceeding to reach factual determinations on those contested material facts, 2 C.F.R. § 180.735(c), unless the SDO finds that requirement is not triggered under the regulation.  Here, despite IRD designation of specific material and contested facts in its response to the Suspension Notice, and the absence of a finding that the requirements of Section 180.735 were not triggered, the SDO did not order or have conducted an independent fact finding procedure, yet, relied upon facts in the Suspension Continuation that were contested by Plaintiffs.

4819-1531-1394.9

22.     Accordingly, rather than follow law and regulation, Defendants arbitrarily and capriciously suspended IRD, in violation of Defendants' own rules and regulations, and in violation of the Administrative Procedure Act.  Defendants' actions in increasing the amount of taxpayer dollars entrusted to IRD speak louder than the words used in the Suspension Decisions to attempt to justify the IRD suspension.  Defendants' own conduct in agreeing to substantial IRD contract extensions, with corresponding increases in the taxpayer dollars entrusted to IRD and its allegedly "inadequate financial controls," contradicts Defendants' assertions in the Suspension Notice that IRD is not presently responsible and that awards to IRD would place taxpayer dollars at risk.

## IV.    STATEMENT OF FACTS

### A.     IRD's Role in Conflict-Ridden Countries

23.     IRD is a non-governmental organization ("NGO") that specializes in empowering vulnerable communities in the most challenging and evolving international environments.  It helps implement United States foreign aid policy and provide aid or relief programs in many of the most dangerous, impoverished, or desperate locations around the globe. For example, IRD has, among many other projects:   facilitated the delivery of shipping containers of food and non-food relief items to 28 countries; provided food, shelter and other necessities to 24,000 victims of armed conflict in Columbia; assisted in delivering vaccinations against polio and measles to nearly 47,000 Syrian refugee children; helped restore cultural heritage sites in Kosovo; and, delivered reinforced concrete pads and tents to house 7,500 internally displaced persons in Northern Iraq.

24.     IRD has a long-standing business relationship with the Federal Government.  IRD, Inc. has been an implementing partner with Defendant USAID since 1998,

4819-1531-1394.9

managing and implementing Defendant USAID programs across the globe.  Since 1998, IRD has provided more than $3.5 billion in humanitarian assistance, including for Defendant USAID programs, through direct service to communities in stricken areas, including through assistance to hospitals, providing medicine, building schools and roads, developing crops for nutrition and income, training for vocational skills and other services.  IRD employees are experts at working in challenging environments, including conflict zones and areas suffering from natural disasters. IRD approaches each of these situations with careful, systematic assessments, and it designs both short- and long-term solutions and interventions by upgrading food, water and sanitation systems, building reliable transportation systems, and revitalizing economies.  IRD's other donors and partners include the United Nations, the United States Departments of Agriculture, Defense, Labor and State, and the World Bank.

25.    Since 1998, IRD and Defendant USAID have worked together on approximately 100 projects, and Defendant USAID has awarded IRD contracts or aid agreements with a value, including extensions of those awards, of more than $2 billion.

**B.**    **The USAID Show Cause Letters**

26.    In the spring and early summer of 2014, the *Washington Post* published a series of stories about IRD regarding the payment of substantial salaries and benefits to IRD's now former President and CEO and his wife, Jasna Keys, and about alleged weak financial accounting, and IRD use of confidentiality agreements.  At about the same time, the USAID-OIG reviewed aspects of IRD's performance on several USAID-funded international projects and identified specific concerns about closed projects in Iraq and Afghanistan.

27.    Defendant USAID sent a June 24, 2014 letter to IRD which generally advised IRD of USAID concerns about IRD's historical performance.  IRD promptly requested a meeting with USAID to obtain specific information regarding USAID's concerns, and the parties

4819-1531-1394.9

met on June 27, 2014.   Defendant USAID issued a supplemental letter on July 1, 2014 that

identified several issues USAID wanted IRD to address, including IRD's project management,

billing practices, delinquent payments to USAID, financial controls and handling of federal

funding, many of which involved already closed contracts and agreements.   The June 24, 2014

and July 1, 2014 letters from USAID to IRD are referred to herein, collectively, as the "Show

Cause Letters."

28.    The Show Cause Letters alleged—without identifying specific factual

bases for concern—that if Defendant USAID continued to fund IRD, unacceptable risks to the

United States Government could result.   The Show Cause letters also asserted that Defendant

USAID had concerns that "seriously call into question IRD's present responsibility to continue

receiving USAID funding."

### C.    IRD's Comprehensive Response to the Show Cause Letters

29.    Immediately after receipt of the Show Cause Letters, IRD implemented a

series of dramatic steps to evaluate its management, organizational structure, compliance and

billing practices to respond promptly and comprehensively to Defendant USAID's articulated

concerns.   In a series of written responses to Defendant USAID in July and August 2014, IRD

submitted multi-volumes of information, which addressed each of the enumerated USAID issues

and outlined the steps that IRD had taken, and would continue to take, to address each issue.   For

example, the IRD Board removed IRD's President and CEO, Dr. Keys, who, as the founder of

IRD and its CEO since its inception, had been primarily responsible for the deficiencies in

management and performance cited in the Show Cause Letters.   IRD replaced Dr. Keys with

Kris Manos, director and board chair of IRD, Inc., as interim IRD CEO.   Ms. Manos had years of

business and organizational governance experience, and she oversaw IRD's search for a new

CEO.   The Board also removed Dr. Keys' wife, Jasna Keys, from the organization.

13

30.     IRD summarized its initial actions and prior communications in a letter to Defendants on August 25, 2014.  IRD's August 25, 2014 letter reemphasized that: IRD had created a Special Committee on Compliance ("SCOC") that was meeting regularly to focus on improving IRD's performance as a transparent and compliant organization; and, IRD had hired a third-party monitor, Affiliated Monitors, Inc. ("AMI"), to provide an independent assessment of IRD's ethics and compliance, and IRD committed to sharing the proposed AMI work plans and recommendations with Defendant USAID.  IRD also summarized its actions to reduce and remediate any alleged improper charges to government programs and to strengthen its already adequate internal financial controls, to cooperate with Defendant USAID, and the numerous other steps IRD was taking to assure the government that it was presently responsible to continue to perform as an implementer of USAID programs.

31.     In September 2014, IRD counsel engaged James D. Gill, CPA ("Gill") to conduct a forensic accounting examination of expenses incurred between 2010 and 2014 by Dr. Keys and charged as indirect costs to IRD and the government.  IRD also retained a third-party finance and accounting expert to conduct a comprehensive examination of its compliance with government contracting rules and regulations.

32.     During the months following the Show Cause Letters in which IRD was taking corrective action and implementing a "change management" process, IRD continued to communicate regularly with Defendant USAID to update the agency about IRD's progress and to discuss terms upon which IRD and the agency would continue to implement the humanitarian and development programs that IRD had been performing around the world.   These communications included face-to-face meetings at USAID offices of IRD personnel and USAID

representatives.  Defendant Djahanbani, the SDO, attended the IRD-USAID meetings at USAID offices on September 4 and 22, October 28, November 17 and December 15, 2105, and held other meetings with IRD representatives.

33.     A "Change Management Plan" adopted by IRD's SCOC in November 2014 detailed corrective action steps designed to address the October 2014 recommendations of AMI, the  independent monitor, for organizational improvements.  In turn, AMI evaluated IRD's planned remedial measures detailed in the November 2014 Change Management Plan, and reported to Defendant USAID on December 2, 2014 that the Change Management Plan addressed the AMI recommendations, and that IRD's plan actually went further than AMI's recommendations.

34.     On November 14, 2014, IRD submitted its Cost Accounting Standards Board ("CASB") Disclosure Statement to Defendant USAID indicating IRD's adherence to and compliance with certain government cost accounting standards applicable to specific types of government procurement contracts.  Defendants have never advised IRD in over six months since this financial controls disclosure was submitted that it has reviewed or undertaken an audit of the IRD CASB Disclosure Statement.  USAID also has never stated that the Disclosure Statement was insufficient or did not address USAID's concerns.

35.     During the monthly face-to-face meetings between IRD and Defendant USAID during the September 2014 to January 2015 period, none of the Defendants, and specifically the SDO, said—or implied—that USAID planned to suspend IRD, or that they believed the materials provided by IRD raised an need for immediate action to protect Government funds, as required by 2 C.F.R. § 180.700(c).  Defendants also did not indicate, directly or indirectly, that IRD's corrective actions were insufficient or ineffective.  In fact, at the

request of USAID, USAID personnel, including Frederick Landry of OAA, attended IRD's annual Leadership Conference in November 2014, and OIG Assistant Special Agent in Charge Alcides Evora presented at the IRD conference on fraud prevention issues.

36.     In October 2014, IRD elected Roger M. Ervin as the new permanent President and CEO of IRD, effective December 1, 2014.  Mr. Ervin brought to IRD experience in government accounting, compliance and management of government service organizations. Dr. Keys was not involved in that selection.

37.     In December 2014, Mr. Gill provided IRD with his preliminary report on 2010-2104 expenses charged by Dr. Keys to IRD and the government.  Ms. Manos advised USAID of IRD's receipt of the preliminary Gill report, and pledged to provide the final Gill report by late January 2015.

38.     New IRD President and CEO, Mr. Ervin, met with USAID leadership in December 2015, including the December 15, 2015 meeting with the Defendant Djahanbani.  Mr. Ervin outlined for USAID leadership his initial plans for restructuring IRD's organization, significant management changes, a refocus on core missions, and implementation of the Change Management Plan recommendations.  Also, in response to requests from USAID, Mr. Ervin provided USAID with a copy of the preliminary Gill report on January 20, 2015.  In those meetings, USAID leadership did not indicate to Mr. Ervin a need for immediate action in the nature of a suspension of IRD, or that USAID was actively considering a suspension of IRD.

39.     On January 13, 2015, AMI representatives met with USAID in connection with preparation of their upcoming quarterly report as independent monitors of IRD.  They subsequently reported through IRD counsel that USAID had not indicated significant concerns with respect to IRD's implementation of the Change Management Plan.

16

**D.     USAID Continues to Award Contracts and/or Assistance Agreements to IRD**

40.     Consistent with a recognition that IRD had taken significant remedial steps and made substantial progress to demonstrate its continuing fitness as a responsible party, Defendant USAID, in the months after it had issued the Show Cause Letters, continued to award IRD new contracts and/or assistance agreements and to issue cost modifications for existing contracts and/or assistance agreements to IRD.   Between July 1, 2104 and January 2015, Defendant USAID issued eight (8) new awards, cost and time extensions and/or contract modifications representing additional funding for IRD programs of over $50 million, one of which for $10.5 million was issued five days before the Suspension was imposed on January 26, 2015.   These eight USAID contracting decisions confirmed that IRD was considered a responsible government contractor/recipient with adequate financial controls capable of successfully performing important USAID programs in Jordan, Yemen, Syria, Ukraine, and Afghanistan.   Defendants also issued three (3) modifications shortly after the January 26, 2015 Suspension Notice extending three other IRD agreements for an additional $28.4 million, on the basis that there was a compelling reason exception for Defendant USAID to select IRD to perform this work despite the suspension. Under 2 C.F.R. £ 180.135, the USAID Administrator or designee had to approve such exceptions.

41.     Ten of the eleven awards and modifications were made without USAID imposing any "specific award conditions" under 2 C.F.R. § 200.207.  To be valid modifications, Defendant USAID necessarily must have determined that IRD met the risk assessment requirements of 2 C.F.R. § 200.205 without the need for further conditions or risk mitigation measures to protect the government or to ensure appropriate stewardship by IRD of USAID funding.  The only award made with "specific conditions" was awarded after the Suspension

17

Notice, and was followed by another award made without "specific conditions." Those Defendant USAID contracting decisions directly contradict Defendant USAID's assertions that awarding additional federal contract/grant funding to IRD would place in immediate peril the Federal Government's interests or U.S. taxpayer funds.

  **E.**   **The Chairman Corker Letter**

    42.   Notwithstanding all the corrective actions steps IRD had accomplished between July 2014 and January 2015, and Defendants' apparent acceptance of same, IRD's entire situation dramatically changed on Friday, January 16, 2015. At that time, Defendant USAID was itself under careful scrutiny by Senator Bob Corker, Chairman of the United States Senate Committee on Foreign Relations, which committee has jurisdiction over United States Senate legislative matters involving Defendant USAID. On January 16, 2015, Chairman Corker issued a letter that severely criticized Defendant USAID for its mismanagement of government funds and programs. Chairman Corker's letter specifically identified IRD and another USAID contractor, Louis Berger Group, Inc. ("LBG"), which also worked on projects in Iraq and Afghanistan and whose Chief Executive Officer had plead guilty to defrauding USAID of tens of millions of dollars over approximately 20 years. LBG paid $18.7 million in criminal fines and $50.6 million in civil penalties for its admitted fraudulent schemes relating to USAID programs in Afghanistan, which activities were reported to USAID by IRD. LBG had been debarred in 2006 by the Asian Development Bank; however, LBG has not been suspended by USAID, either as of January 16, 26, or as of today.

    43.   In the January 16, 2015 letter, Chairman Corker identified historical performance issues with IRD projects in Iraq and Afghanistan. In particular, Chairman Corker chided Defendant USAID for failing to effectively ensure that IRD—under its past leadership and prior to its enhancement of myriad financial controls—satisfied performance goals or

objectives relating to those programs.   For example, Chairman Corker's letter criticized

Defendant USAID for not ensuring that IRD matched needs identified in the communities it was

serving, made adequate and timely progress on certain programs, carried out quality work in a

particular school project, and other programmatic issues.   Notably, the performance and

management concerns listed by Chairman Corker's about IRD, all non-fraud, non-criminal in

nature, were in stark contrast to the allegations of fraud, criminal conduct, and extensive criminal

and civil penalties against LBG and the guilty plea by its CEO.

44.     Chairman Corker admonished Defendant USAID, including to state "it is

also difficult to understand why, after years of such failures and lapses in basic oversight,

USAID cannot get its act together and serve as a good steward of U.S. tax dollars. . . it is telling

that Asian Development Bank has essentially debarred LBG since 2006.  With this in mind, we

request that the Agency expeditiously review all ongoing USAID contracts and grant agreements

with LBG, IRD, and other contractors with similar histories."

45.     The Chairman Corker letter concluded, "by January 30, 2015, please

report back the result of your review including whether suspension and debarment proceedings

should immediately be initiated against LBG, IRD, or other similarly-situated contractors and

describe in detail your plan for getting USAID's oversight of its contractors back on track."

F.     **USAID's Proposed Informal Action, Followed By Issuance of the Suspension Notice**

46.     In the wake of the Chairman Corker letter to USAID, Mr. Ervin was

summoned to a meeting with Defendant Djahanbani, the SDO.   At a meeting on January 21,

2015, the SDO insisted that IRD agree to a limited sixty-day "cooling off period" during which

IRD would voluntarily refrain from submitting new proposals.  Provided IRD agreed to the "60-

day cooling-off period," the SDO indicated IRD would not be formally suspended.  While even

the informal "cooling-off period" represented a complete about-face compared to the agency's pre-January 21st approach to IRD, faced with the "Hobson's choice" of an informal action or formal suspension, Mr. Ervin agreed to the "cooling-off period." Also on January 21, 2015, Mr. Ervin met with the USAID OIG and learned of an ongoing OIG investigation of IRD. Mr. Ervin pledged IRD's full cooperation.

47.     The very next day, January 22, 2015, Defendants abruptly changed course, again. On that day, the SDO informed IRD that unspecified "pressures" required that the SDO abandon the "cooling-off period" the SDO had proposed on January 21st, and that IRD had accepted. Instead, the SDO would be required to formally suspend IRD. No further explanation for this abrupt change of course was provided, but IRD understood those developments to mean that the "cooling-off period" had been vetoed by senior USAID management.

48.     Four days later, on January 26, 2015, the SDO issued the Suspension Notice to IRD. This was barely one week after Defendant USAID received the Chairman Corker letter, and four days before USAID's response was due to Chairman Corker.

49.     According to the Suspension Notice, IRD, to whom Defendant USAID had just awarded $10.5 million in addition program work on January 21, 2015 in areas of critical need to United States foreign policy interests, had suddenly become an imminent financial risk to the U.S. government.

50.     Prior to the January 21, 2015 "cooling-off period" proposal, Defendants had not suggested they viewed additional corrective action or remediation by IRD would be necessary for IRD to avoid suspension or to address Defendants' areas of concern, nor had Defendants identified aspects of IRD's program that presented immediate risks to the government. Quite to the contrary, Defendants acknowledged in the Suspension Notice several

of the improvements and corrective measures that IRD had taken, but commented that Defendants were uncertain whether those measures would be fully and quickly effective.

51.    The Suspension Notice identified two bases for the suspension: (a) mischarging of expenses over a four-year period (which necessarily ended with the former IRD President/CEO's retirement and resignation on August 31, 2014), and the continued employment by IRD of other IRD employees who were (or may have been) responsible for detecting and preventing the mischarges; and (b) an alleged lack of adequate financial controls at IRD. However, the Suspension Notice did not identify any specific individuals who it perceived needed to be terminated, or any financial controls as being weak or ineffective.   The other alleged deficiencies identified in the Show Cause Letters were not identified as grounds for the IRD Suspension.

52.    In reality, the bases identified in the Suspension Notice did not present an immediate risk of harm to the government.   Rather, the only immediacy facing USAID on January 26, 2015 as to IRD was the need to respond to Chairman Corker by the January 30, 2015 deadline regarding whether suspension or debarment proceedings had been initiated against IRD.

G.    **USAID Was Aware for Months of the Issues Asserted in the Suspension Notice as Allegedly Giving Rise to the Need for Immediate Action, And USAID Effectively Admitted IRD's Corrective Action Plan Had Addressed Virtually All On-going Compliance Concerns**

53.    The conduct and events alleged by Defendants to be the basis for the January 26, 2015 Suspension Notice and the need for immediate action had been known to Defendants for months before the Suspension Notice was issued, and had been or were being addressed by IRD.

54.    Months before January 26, 2015, the date of the Suspension Notice, USAID was advised that IRD, on its own initiative, had: (i) commissioned AMI, the independent

monitor, in July 2014 to conduct a sweeping review of IRD's operations and management; (ii) engaged a forensic accountant in September 2014 to review and analyze expenses charged by IRD's former president, his relatives and his office; (iii) presented the independent monitor's report to Defendant USAID in October 2014; (iv) adopted a comprehensive Change Management Plan in November 2014; and (v) filed its CASB Disclosure Statement in November 2014 with USAID.

55.     These corrective actions were all disclosed to Defendants by IRD, and IRD responded to follow-up questions raised by Defendants about those corrective actions.  To IRD's knowledge, IRD had addressed every material question Defendants raised.  IRD also kept Defendants informed of important developments in its remediation efforts through: (i) multiple briefings and conference calls; (ii) copies of reports and responding to follow-up documents requests; and, (iii) inviting USAID personnel to attend IRD's November 2014 leadership conference, where additional compliance efforts by IRD were discussed.  Indeed, Defendants' knowledge of these corrective action steps certainly contributed to Defendant USAID's decisions to make numerous Federal awards, including extensions, to IRD after the Show Cause Letters were issued.

56.     Moreover, IRD's corrective action plan had, as of January 26, 2015, addressed virtually all ongoing compliance issues, a point effectively acknowledged by the Suspension Notice itself.  First, the Suspension Notice made little or no mention of the issues that USAID had raised in the Show Cause Letters, effectively admitting that IRD had addressed and resolved them.  Second, while the Suspension Notice referred to the third-party monitor report prepared by AMI, it failed to include AMI's report to USAID that IRD's extensive Change Management Plan had comprehensively addressed all areas of concern identified by

22

AMI.   Third, the Suspension Continuation gave only passing reference to the Change Management Plan, which all but concedes that the Change Management Plan was well underway and working.   Indeed, the only issue from the Change Management Plan that the Suspension Notice did discuss was that IRD's labor charging corrective actions would not be completed until December 2015; this discussion was wrong because those actions had already been completed.

57.   Prior to the Suspension Notice, Defendants did not indicate that IRD's disclosures triggered a need for immediate action by USAID to protect the government's interest. To the contrary, USAID had effectively signaled that IRD's disclosures and actions over the August 2014-January 2105 timeframe did not even trigger a need for specific conditions on USAID awards to IRD, much less immediate action in the nature of a suspension.

58.   Any doubt that circumstances as of January 26, 2015 did not warrant immediate action sufficient for a suspension is resolved by the SDO's 60-day "cooling off period" proposal of January 21, 2015, offered in lieu of a suspension.   On January 21, 2015, the SDO was possessed of all the information subsequently relied upon in the January 26, 2015 Suspension Notice, including the preliminary Gill report provide to Defendant Djahanbani on January 20.   That on January 21, 2015 the SDO considered a "cooling off period" sufficient, and a suspension not required, confirms conclusively that immediate action was not required as of that date, five days before the Suspension Notice.   The only things that changed between January 21 and January 26 were that: (a) USAID management apparently had—with no new evidence— vetoed the SDO's "cooling off period" proposal; and, (b) the date for USAID to respond to Chairman Corker had become more imminent.

### H.   IRD's Response to the Suspension Notice

59.   IRD challenged Defendants' January 26, 2015 suspension decision immediately, including through numerous communications with USAID representatives.   IRD

4819-1531-1394.9

further challenged Defendants' Suspension Notice with a formal response timely submitted to USAID on February 27, 2015, in accord with the applicable regulation, 2 C.F.R. 180.730.

60. Despite its then-present responsibility, IRD directly addressed the pretextual concerns raised in the Suspension Notice, as Mr. Ervin immediately implemented decisive, transformational change to IRD's management and governance. To meet Defendants' expressed concerns, IRD discharged additional senior management whose continued presence at IRD had allegedly caused some of the concerns Defendants articulated in the Suspension Notice. IRD also streamlined headquarters staff, reducing overhead to create a leaner IRD that could be a more cost-effective implementer of programs and contracts. IRD also reconstituted the IRD, Inc. Board of Directors.

61. IRD also commissioned the two national accounting firms, BDO and EY, to address the alleged mischarging and financial controls issues raised in the Suspension Notice. BDO undertook an assessment of the 2010-2104 IRD Office of the President mischarging issues covered by the Gill report, and commenced a detailed, comprehensive review of the other IRD indirect costs that IRD had treated as allowable during fiscal years 2009 through 2014 to assure that IRD indirect costs paid government during that period were properly allowable in accord with applicable cost allowability requirements. BDO found that the Gill report was breathtakingly inaccurate, as it had overstated the extent of unallowable expenses of IRD's Office of the President by almost 50%. As to IRD's other indirect costs, BDO's initial report covered FY 2013, and it concluded that only 2% of IRD's previously claimed FY 2013 indirect costs were actually unallowable. Thus, per BDO's assessment, IRD's prior total incurred cost submissions for 2013 had been more than 97.5% accurate.

4819-1531-1394.9

62.   EY evaluated IRD financial systems and controls, and confirmed they were adequate for Federal awards and contracts.   IRD informed Defendants that EY would continue its work to help IRD implement additional improvements in financial systems and controls, above and beyond those required by law.

63.   On February 7, 2015, AMI delivered a follow-up monitoring report to IRD and Defendant USAID noting that "IRD has been fully cooperative with AMI's efforts from the outset," and endorsing IRD's commitment to address and remedy the historical weaknesses AMI had identified.   On February 25, 2015, AMI provided a letter in which it confirmed its investigation had not found any instances of fraud in IRD's programs.

64.   IRD's formal response to the Suspension Notice on February 27, 2015 (the "Response") provided detailed information and extensive supporting exhibits to establish that IRD is and was in January presently responsible pursuant to the applicable non-procurement and procurement regulations, 2 C.F.R. § 200.205 and FAR 9.104-1.   This included information sufficient to establish that IRD was financially stable and had in place significant and robust systems for financial management and controls adequate to receive Federal awards and cost-type contracts.   The Response also included a report prepared by EY which had examined IRD's internal control structure and systems, including IRD's use of government-approved financial systems software, and had found those financial management and controls systems to be adequate.   The Response explained that IRD's CASB Disclosure Statement had provided detailed information on IRD's accounting practices, and established IRD's current compliance with applicable CASB government accounting principles.

65.   IRD's Response also addressed its long history of strong performance fulfilling USAID programs and contracts, and confirmed that IRD's business ethics and

25

compliance programs and training permitted IRD to implement applicable statutory and regulatory requirements, even though those matters were not formally a present responsibility requirement under the NCR standards.  IRD also set out the substantial mitigating factors that Defendants had failed to consider in determining that IRD should be suspended.

      66.    After its initial review of the Response, USAID posed a series of written follow-up questions on March 27, 2015.  IRD timely responded in writing on April 6, 2015 ("Supplemental Response").  The Supplemental Response: (a) provided additional discussion of the BDO report on unallowable costs for FY 2013; (b) provided additional details on the report on FY 2009-2012 and reported that BDO anticipated completion of that report by May 29, 2015 (actually delivered on June 5, 2015); (c) provided a further breakdown of the Office of the President unallowable costs for FY 2010-2014 and IRD plan for repayment ($1.19 million repaid on April 22, 2015); (d) indicated that IRD was not having Mr. Gill prepare a "final report," given the large order of magnitude of error (50% overstatement of unallowable costs) in his preliminary report; (e) provided an update on the revised NICRA; (f) provided a further explanation of why IRD considered the SDO's "60-day cooling-off period" to have been "overruled" by senior USAID management, due to unspecified "pressures"; (g) addressed the DUNS number issue concerning IRD US, Inc.; (h) supplemented the EY Internal Controls Initial Assessment Report ("EY Report"); (i) addressed an IRS Form 990 issue concerning former employee Jasna Keys; and (j) addressed IRD financial statement issues.

## I.    The April 13, 2015 Suspension Continuation

      67.    Despite the volumes of information presented by IRD in its February 27, 2015 Response and April 6, 2015 Supplemental Response, on April 13, 2015, Defendant Djahanbani determined to continue the suspension based on four factors:  (1) lack of present responsibility; (2) the pending OIG investigation; (3) the need for more time to "fully realize[]"

comprehensive changes; and, (4) concerns as to financial and management controls related to the NICRA. Suspension Continuation, at 1.  The Action Memorandum ("SC Action Memo") on which the Suspension Continuation relies repeated the present responsibility point, and then specifically linked its recommendation to the "on-going investigation by the USAID OIG[.]"  SC Action Memo., at 14.

68.    The April 13, 2015 Suspension Continuation, and the SC Action Memo, do not address, much less demonstrate, there was an immediate need for suspension or an ongoing threat that taxpayer dollars were at risk

69.    The Suspension Continuation and SC Action Memo do not indicate that the Defendants performed any independent analysis to evaluate whether IRD had adequate financial controls, was presently responsible, or had sufficient financial systems in place to comply with CASB and Truth in Negotiations Act ("TINA") accounting requirements.  Although the Suspension Continuation makes comments about certain materials submitted by IRD, Defendants do not identify an expert akin to BDO or EY, nor does it appear they had their own internal auditors review IRD's technical information.  Defendants continued the IRD Suspension based on the proposition that "the Respondent has not demonstrated its present responsibility and consequently, the Agency must continue its suspension of the Respondent in order to safeguard taxpayer dollars."

70.    The Suspension Continuation also failed to address IRD's November 2014 CASB Disclosure Statement, and while acknowledging  IRD's detailed presentation about its cost accounting and financial policies, practices and procedures, continued to vaguely, and without support, accuse IRD of having deficient financial controls.

71.     The key and fatal weakness in Defendants' analysis is revealed by its conclusion: "Taken together, the Respondent's submission indicate that the Respondent is making progress, but has not yet fully developed, implemented and tested the robust internal control system that it touts."  SC Action Memo, at 16.  The pertinent present responsibility issue, of course, is not whether IRD has yet attained the "fully developed, implemented and tested the robust internal control system that it touts," but rather whether the IRD internal controls systems as they existed on January 26, 2015 were adequate for IRD to be presently responsible and be awarded cost-type contracts and awards.

72.     Tellingly, the Suspension Continuation and SC Action Memo do not address that essential point.  They fail in this regard even though (a) the EY Report expressly stated that IRD: "maintains an accounting system that meets fundamental cost accounting control requirements related to segregation of direct and indirect costs, project accounting and accounting and exclusion of unallowable costs.  In addition, IRD maintains an active ethics and code of conduct program, which includes a hotline that has resulted in a number of disclosures to the Government[,]" and (b) the Supplemental Response reported to USAID that EY confirmed that the foregoing statement meant IRD met the requirements of Standard Form 1408, which provide the criteria used by the government to assess a recipient's ability to perform and administer cost reimbursement awards.  EY Report, at 2; Supplemental Response, at 13.

73.     Nor does the Suspension Continuation or SC Action Memo discuss, much less explain, why it is necessary for IRD to attain the "fully developed, implemented and tested" internal control system in order to meet basic requirements for present responsibility.

74.     The only specific "risk" identified with respect to IRD internal controls is that, "[s]ome of the weaknesses EY notes could permit mischarging similar to that which

occurred in the Respondent's Office of the President and went undetected for years."  SC Action

Memo, at 15.  Neither the Suspension Continuation or SC Action Memo discuss this "risk" point

further—and for good reason—as Defendants were aware that IRD had, on its own,

commissioned the Gill report to address this very point, and that BDO had established that the

actual mischarging by Office of the President in FY 2014, the year immediately preceding

January 26, 2015, was just $22,012.96, Response, Ex. at 7 (excluding certain American Express

card charges), and that even the Gill report had found only $76,149.39 in those mischarges

during that year.  *Id.* at 4  (also excluding certain American Express card charges).  Separately,

the Gill report identified an additional $19,925.39 American Express charges in FY 2014 which

IRD acknowledged were unallowable.  Thus, the totals for FY 2014 including those charges

were $41,938.35 (BDO) and $96,074.78 (Gill).  These totals compare to more than $24 million

in total IRD indirect claimed costs in FY 2014, bringing the total actual mischarging risk from

mischarging alleged by Defendants was between .1 and .3 of one percent of total indirect costs.

Moreover, both BDO and the Gill reports established the overall trajectory of those mischarges

was sharply down from FY 2010.  *Id.*   Thus, the evidence of record established that, as to the

sole risk identified by Defendants, by FY 2014 IRD's internal controls were performing quite

well, having all but eliminated the only problem Defendants had identified more than a year

before the Suspension Decisions.

       75.     In like manner, the Suspension Continuation fails altogether to address

that the BDO report demonstrated that as of FY 2013—more than a year before the Suspension

Decisions—IRD's financial controls had already "sufficiently established" that IRD's incurred

costs submissions achieved more than a 97.5% accuracy as to all other indirect costs besides

those of the Office of the President.  Response, Ex. 6, at 18 ($498,239 in unallowable charges

against $24,461,277).  Even taking the total Office of the President FY 2014 mischarging into account, the accuracy rate of IRD's allowable indirect cost reporting remains above 97.5% Thus, unless an accuracy rate of 97.5% were considered an unacceptable risk to the government, the actual, unrebutted facts in the administrative record were directly contrary to Defendants' conclusion that IRD's internal financial controls were so inadequate as to render IRD not presently responsible.

76.     Instead, the Suspension Continuation was based on Defendants' erroneous and unlawful assessment that, even though the corrective measures IRD had adopted were sufficient on their face to demonstrate its present responsibility as of the date of the Suspension Continuation, Defendant USAID could continue the suspension in place until such indeterminate time as Defendant USAID, in its sole discretion, feels comfortable that IRD's financial and other internal controls had sufficiently "taken hold."  This approach effectively holds IRD to a standard of "present infallibility" not "present responsibility."  In essence, IRD must affirmatively prove it is perfect and no mischarging could ever occur, a standard to which no other federal contractor or grantee has been held.  The Response demonstrated that IRD has functional, effective controls in place, and that is what is required by regulation.

77.     Defendants also attempted to support the preordained conclusion that the IRD Suspension would not be lifted by relying on unidentified information outside the administrative record.  For example, despite being told that its assumption was factually wrong, Defendants recited in the Suspension Continuation that it appeared "that IRD U.S. began preparing to do business with the federal government the day after the Agency suspended IRD, Inc."  Without facts to support its conclusion, Defendants essentially accused IRD of bad faith and misconduct by allegedly seeking to avoid the impact of the Suspension Notice through the

use of a different IRD corporate entity to do business.  Plaintiffs addressed specifically in the Supplemental Response why that position was false, yet Defendant continued to note it in the Suspension Continuation.

78.     Defendants also relied as a material basis for their decision to continue the suspension on the existence of a parallel investigation underway by the Department of Justice with assistance by Defendant USAID-OIG staff.  Without referring to any particular document, purported witness statement or other information from the investigation, all of which information would be outside the administrative record, Defendants referred to the "ongoing OIG investigation" as a material reason why "the continuation of the Respondent's suspension is in the best interest of the Agency and USG."  Notably, the investigation referenced by Defendants pertains to alleged misconduct during the tenure of IRD's former CEO, who has had no IRD role since August 2014 and whose alleged conduct has no bearing on the present responsibility of IRD under its current management—particularly in light of the acknowledged transformative change carried out by IRD's new CEO, Mr. Ervin.

79.     Elsewhere in the April 13, 2015 Suspension Continuation, Defendants stated that "consequently, and in light of the ongoing investigation by the USAID OIG, the suspensions should not be lifted."  Not only was this reliance on material outside the administrative record, it represented an unlawful change in basis for the suspension without prior notice to IRD and providing an opportunity to respond.  The Suspension Notice was predicated expressly and solely upon the "catch-all" suspension provisions of 2 C.F.R. §§ 180.700(b), (c), and § 180.800(d), as the regulatory basis for the suspension.  The belated agency decision in the Suspension Continuation to rely on the OIG investigation constituted a change in midstream *from* reliance on Section 180.700(b) and 180.800(d) as the basis *to* Section 180.700(a) — "other

evidence to suspect an offense listed under 180.800(a)" —and Section 180.800(a).

80.    Moreover, that Defendant USAID perceived the need to add this new basis—albeit unlawfully as without notice and opportunity to be heard—signals loudly that USAID recognized its original ground was so conclusory that it would not stand the close examination that it would receive under judicial review.

81.    Another material underpinning for the April 13, 2015 Suspension Continuation was statements about the alleged historical mischarging of costs to Defendant USAID by IRD's former CEO, Dr. Keys.   Defendants were critical of BDO's work, characterizing BDO's work as only "tentatively" identifying approximately $1.2 million in unallowable or unsubstantiated costs, and expressed concern there was no assurance that the BDO analysis would ever be completed.

82.    As Defendants were fully aware, BDO and IRD had worked tirelessly to be able to provide the BDO report as part of the Response—fewer than 35 days after the Suspension Notice—and though the BDO analysis was still ongoing on February 27, 2015, in the Response IRD expressly and repeatedly represented that it would make arrangements to pay that amount.  Response, at 3, 29.  In fact, consistent with that representation, IRD made a good faith payment to Defendants in the amount of almost $1.2 million on April 22, 2015 in satisfaction of most of the unallowable or unsubstantiated costs BDO had identified.

83.    Defendants cited as another pretextual basis for continuing the suspension that IRD had allegedly and historically improperly used an inappropriate, negotiated, indirect cost reimbursement rate ("NICRA") of 24.01% to bill Defendant USAID for cost reimbursement, and that "after repeated inquiries, the Agency is no closer to a newly established NICRA."  This statement by Defendants ignores the very nature of the manner in which NICRA

rates are established and "trued-up."   As explained in USAID's own policy documents describing the administration of the NICRA program, USAID Memorandum for All Contracting Officers and Negotiators, *Indirect Cost Rates*, October 31, 1992 at 2-4, *available at* http://www.usaid.gov/sites/default/files/documents/1868/cib92_17.pdf the implementer and USAID, as the government's Cognizant Agency, reach agreement on the provisional or billing NICRA rate at the beginning of a fiscal year, typically based on the implementer's indirect cost experience from the prior fiscal year.   In IRD's case, that is 24.01% for fiscal year 2015.   That provisional rate is used for billing purposes throughout the current (2015) fiscal year, subject to recalculation of the final indirect cost rate after conclusion of the fiscal year, when the implementer's actual indirect cost experience is known, and the implementer submits its final incurred cost submission.   If that year-end "true-up" process yields a lower final NICRA rate than the provisional NICRA rate used to bill indirect rates during the preceding fiscal year, the implementer is responsible for making restitution to the government for the difference between the application of the provisional and final NICRA rates.   Conversely, if the final NICRA rate is higher than the provisional rate used during the year, the implementer would be able to receive additional monies from the government.

      84.   The NICRA program does permit interim, mid-fiscal year adjustment of the provisional rate where appropriate, and IRD represented expressly in the Response that it would do so once it had the BDO final report that covered the FY 2014 indirect costs, which had been the basis for its FY 2015 provisional rate:  "Additionally, IRD's 2015 NICRA provisional rate shall be immediately adjusted, if necessary, to reflect the removal of unallowable charges from the 2014 indirect cost pool." Response, at 30.  This very point was repeated at page 32 of the Response.  The Supplemental Response of April 6, 2015 indicated the preparation of a

33

revised proposed NICRA rate was still underway.  Supplemental Response, at 3.  Thus, it was entirely proper for IRD to use its approved provisional NICRA rate for billings in the near-term until the BDO final report was delivered, which had not occurred as of April 13, 2015.  (The BDO report has since been completed and disclosed, and IRD reduced its provisional FY 2015 NICRA rate from 24% to 19%.)

85.     Nevertheless, the Suspension Continuation erroneously and pretextually attempted to justify the IRD Suspension by citing IRD's alleged failure voluntarily to renegotiate and revise its approved provisional NICRA rate—a step Defendants had not cited in the Suspension Notice as necessary for IRD to establish its present responsibility—as purported evidence confirming that IRD continued to lack present responsibility.     Specifically, the Suspension Continuation asserted that "the Respondent does not appear to fully understand the need to submit a revised NICRA.  At base, the Respondent claims that it is presently responsible despite using an inaccurate NICRA for its ongoing work.  Consequently, and for the other reasons set forth herein, the Respondent has not demonstrated that it is presently responsible."  As the Response repeatedly made clear, IRD did understand its responsibility to submit a revised NICRA—and repeatedly promised to do so once it had the BDO final report—raising the obvious question of how carefully Defendants actually read the Response.

86.     In any event, the Suspension Continuation's ultimate conclusion—predicated expressly on this very point—is patently wrong and contrary to the facts in the administrative record.  It was manifestly arbitrary, capricious, and unreasonable, and contrary to the procedures designed to provide suspended entities due process in contesting their suspensions, for Defendants to rely in the Suspension Continuation on a new basis for questioning IRD's present responsibility, then ignore what IRD submitted on that very point.

34

**J.      Defendants' Conduct Represents Irreparable Harm To IRD**

87.     The IRD Suspension has caused and will continue to cause substantial harm to IRD by preventing IRD from competing for government grants and awards, and from obtaining substantially any subcontracts or sub-awards under federal contracts and assistance agreements until at least January 2016.

### COUNT I
### (Violation of the Administrative Procedure Act)
### (All Defendants)

88.     IRD hereby incorporates by reference the allegations made in paragraphs 1 through 87 above, and realleges them as though fully set forth herein.

89.     The Suspension Decisions, and specifically the Suspension Continuation, constitute final agency action.

90.     The Suspension Decisions violate the Administrative Procedure Act as arbitrary, capricious, an abuse of agency discretion, unsupported by substantial evidence, or otherwise not in accordance with law and regulation.  The Suspension Decisions are not supported in key respects by, or are contrary to, the facts established in the administrative record, reflect a failure to consider all relevant and material information and is contradicted by the administrative record, particularly when considering the substantial evidence demonstrating that IRD is presently responsible, the substantial and ongoing remedial measures undertaken by IRD both long prior to and after Defendants issued the Suspension Notice, and the relevant mitigation factors.  2 C.F.R. §§180.125(c), 180.700(c), 180.750(a).

91.     The Suspension Decisions do not establish an immediate need for suspension to protect the public interest, as required by regulation, 2 C.F.R. §§180.125(c), 180.700(c).

4819-1531-1394.9

92.     Defendants' suspension decision is not the product of reasoned decision-making by the SDO based on the administrative record, as required by the law. *See id.* § 180.705(a).  Instead, the Suspension Notice was, in reality, a political decision by senior agency management and/or the SDO based on the agency's perceived need to take some immediate action in order to respond by January 30, 2105 to the Chairman Corker letter of January 16, 2015 with a demonstration that the agency had addressed the matters raised in that letter.  Faced with the reality that USAID had apparently decided not to suspend LBG—notwithstanding LBG's admitted criminal conduct—putatively suspending IRD was the only recourse immediately available to the agency.  That the SDO had serious reservations as to whether suspension of IRD was warranted is demonstrated by the initial proposal of an informal "cooling off period" in lieu of a suspension, only to be apparently compelled to abandon that approach by agency management within a day.

93.     The Suspension Decisions were also not the product of a decision of the SDO independent of agency management.  Rather, they were agency decisions effectively dictated to the SDO by agency management to address agency political concerns, as shown above by the SDO's change in position on the "cooling off period," and the need to respond to the Chairman Corker letter.  Furthermore, Defendant USAID has established and maintained a suspension and debarment process that results in an inherent conflict of interest in the Defendants' decision-making process that reinforced the challenges the SDO faced to render an independent suspension decision in this matter.  Under USAID's organizational structure, the SDO simultaneously serves as USAID's OAA Director, responsible for supervising the agency's overall awarding of contracts, grants, and assistance agreements, including those to IRD.

94.     As a result, issues that were raised in the suspension process as to IRD and considered by the SDO in that capacity concerned issues that Defendant Djahanbani, in his capacity as OAA Director,  had dealt with directly in that capacity for several years.  The OIG, in Office of Inspector General, Audit of USAID's Process For Suspension and Debarment, October 1, 2009, at 21-22, available at https://oig.usaid.gov/sites/default/files/audit-reports/9-000-10-001-p.pdf, noted that USAID was the only federal agency that assigned the duties of suspension and debarment to the OAA Director, noted inherent problems in that arrangement and recommended that USAID consider changing it—which obviously—in the ensuing six years, has not been done.  Thus, the SDO was—by virtue of the agency's long-criticized decision to combine these roles—placed in the untenable position of rendering suspension decisions on matters on which he was directly involved in his capacity as OAA Director, rendering an independent decision on suspension nearly impossible.

95.     Because Defendants lacked a legal basis to suspend IRD, the suspension constitutes a punitive action, contrary to regulation.  Indeed, the almost single-minded focus of the Suspension Notice and Suspension Continuation on alleged historical mischarging issues and other alleged deficiencies predating the current management at IRD, confirm that the Suspension Decisions were a sanction for perceived past misconduct or deficiencies in IRD internal controls. As of the date of the Suspension Decisions, Defendants had long known of the events and conduct alleged to be the basis for the IRD Suspension, and concluded that, at most, they warranted an informal, non-suspension, not a formal suspension.

96.     IRD's Response to the Suspension Notice raised genuine disputes of facts material to the suspension decision—in particular, Defendants' allegation that IRD lacked the financial controls necessary to be a responsible implementer.   Yet, Defendants failed to

undertake the mandatory fact-finding process required by the regulations establishing the procedures for a suspension decision.

97.    Defendants also improperly reached outside the administrative record for information to allegedly support their continuation of the IRD Suspension by referring to an OIG investigation into conduct unrelated to present responsibility.  It is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law for Defendants to substantially rely on information outside the official administrative record to support a final agency action, and to alter the basis for the suspension in mid-stream without providing IRD with notice and an opportunity to be heard.

98.    It is also arbitrary, capricious, and an abuse of discretion and otherwise not in accordance with law for Defendants to have imposed a suspension without having first determined that Defendants' stated concerns as to IRD's internal controls could not be resolved with steps such as by conditioning awards and contract extensions issued to IRD with "specific award conditions" that address and adequately mitigate any purported risk presented by IRD's alleged inadequate financial controls or other issues.

99.    For these reasons, Defendants' suspension of IRD, and the continuation of that suspension, is contrary to law and regulation; is unsupported by the record in this matter; is arbitrary, capricious and an abuse of discretion; and otherwise not in accordance with law, all in violation of 5 U.S.C. § 706.

## COUNT II
### (Declaratory Judgment Act)
### (All Defendants)

100.    IRD hereby incorporates by reference the allegations made in paragraphs 1 through 99 above, and realleges them as though fully set forth herein.

38

101.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to "declare the rights and other legal relations of any interested party" to a case or controversy over which the Court has subject matter jurisdiction.

102.    As a result of Defendants' issuance of the Suspension Notice to IRD and their refusal to lift the suspension, a case or controversy exists between IRD and Defendants relating to the legality of those actions.

103.    IRD requests the Court to declare the rights and obligations of the Plaintiffs and Defendants in this matter including that this Court: declare the suspension null, void and unenforceable; enjoin Defendants from enforcing the IRD Suspension and from continuing to prevent IRD from participating in procurement and non-procurement programs; enjoin Defendants from their continued wrongful actions to interfere with IRD's performance of pending grants and contracts and to grant other relief to redress Defendants' arbitrary, capricious and punitive actions toward IRD; and, declare Defendant Djahanbani to be conflicted from further proceedings relating to the IRD Suspension.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

A.    Declare that Defendants' suspension of IRD, and the continuation of that suspension, is in excess of Defendants' authority and limitations, and is punitive, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, thus rendering the IRD Suspension null, void and unenforceable;

B.    Declare that Defendants' failure to determine that IRD is presently responsible is in excess of Defendants' authority and limitations, and is punitive, arbitrary, capricious, an abuse

of discretion and otherwise not in accordance with law, thus rendering the IRD Suspension null, void and unenforceable;

C.      Declare that Defendant USAID's suspension of IRD from entering into federal procurement contracts and nonprocurement agreements is in excess of Defendant USAID's authority and limitations, and is punitive, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, thus rendering the disqualification null, void and unenforceable;

D.      Enjoin Defendant Djahanbani from participating in any consideration or decision of any kind that relates to suspension actions as to IRD, and as to procurement or non-procurement grants, awards, cooperative or assistance agreements to IRD, because of the inherent conflicts of interest of his joint role as SDO and OAA Director;

E.      Order Defendant USAID, as the cognizant federal government agency, to advise all other U.S. Government agencies that the suspension has been lifted and that there is no impediment to the consideration of any IRD application for a grant or award or for the awarding of a grant or award to IRD;

F.      Issue preliminary and permanent injunctive relief against enforcement of USAID's Suspension Decisions;

G.      Award IRD its reasonable attorneys' fees and costs expended herein; and,

H.      Grant such other and further relief as this Court deems just.

4819-1531-1394.9

Dated:  June 9, 2015

_Paul R. Monsees   /s/_

Paul R. Monsees DC Bar No. 367138
pmonsees@foley.com
David T. Ralston, Jr. DC Bar No. 386874
dralston@foley.com
Zachary L. Coffelt DC Bar No. 1022918
zcoffelt@foley.com (Pro Hac Vice pending)
Foley & Lardner LLP
Washington Harbour
3000 K Street, N.W.
Suite 600
Washington, D.C. 20007-5109
202.672.5300 (t)
202.672.5399 (f)


Lisa Noller IL Bar No. 6229957
lnoller@foley.com
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, Illinois 60654
312.832.4500 (t)
312.832-4700 (f)
(Pro Hac Vice pending)

Attorneys for Plaintiffs

4819-1531-1394.9